**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

**IN RE: LORI MICHELLE KANTZ AND ANTHONY IRVIN KANTZ** — **NO. 23-50401-KMS**

**21ST MORTGAGE CORPORATION** — **MOVANT**

**VS.**

**LORI MICHELLE KANTZ AND ANTHONY IRVIN KANTZ, DEBTORS AND DAVID RAWLINGS, TRUSTEE** — **RESPONDENTS**

**MOTION TO ABANDON COLLATERAL AND LIFT STAY**

21st Mortgage Corporation brings this motion to abandon collateral and lift and terminate the automatic stay of 11 U.S.C. § 362.

1. The Debtors are indebted to 21st Mortgage Corporation under a Consumer Loan Note, Security Agreement and Disclosure Statement dated January 25, 2011, a copy of which is attached as Exhibit "A".

2. As collateral for the indebtedness due, the Debtors granted 21st Mortgage Corporation a Deed of Trust dated January 25, 2011, recorded February 15, 2011 as Instrument No. 21100922 in the office of the Chancery Clerk of the Second Judicial District of Jones County, Mississippi, a copy of which is attached as Exhibit "B". The Deed of Trust encumbers the Debtors' 7.94 acres, more or less, located at 40 Blake Bottom Drive, Ellisville, Jones County, Mississippi, as more particularly described in Exhibit A to the Deed of Trust, together with a 2005 Indies manufactured home, Serial Nos. AL28801055176A and AL28801055176B, and all improvements, fixtures and appurtenances (the "Collateral").

3. The Debtors have defaulted on the direct payments due to 21st Mortgage Corporation. The account is due for the October 15, 2026 and November 15, 2026 installments in the total amount of

$2,514.92. The Collateral has a scheduled value of $45,000.00. 21st Mortgage Corporation is entitled to recover its attorney fees and costs in bringing this motion.

4. 21st Mortgage Corporation requests that upon termination of the automatic stay, such termination shall become immediately effective and enforceable and shall not be stayed by Bankruptcy Rule 4001 (a)(4). The Debtors have repeatedly fallen behind on their payments, and 21st Mortgage Corporation should not be required to wait an additional fourteen days to enforce its rights.

WHEREFORE, PREMISES CONSIDERED, 21st Mortgage Corporation requests that this Court abandon its collateral and lift and terminate the automatic stay of 11 U.S.C. § 362 and grant such other relief as is necessary under the circumstances.

DATED: November 16, 2026

**21ST MORTGAGE CORPORATION**

By: /s/ Jeff Rawlings
Its Attorney

**CERTIFICATE OF SERVICE**

I served a copy of the foregoing on November 16, 2026 by mail upon Lori Michelle Kantz and Anthony Irvin Kantz, 40 Blake Bottom Dr, Ellisville, MS 39437 and via the ECF notification service upon Thomas Carl Rollins, Jr., David Rawlings and the Office of the U. S. Trustee.

/s/ Jeff Rawlings
Jeff Rawlings

Jeff Rawlings
Rawlings & MacInnis, P.A.
P.O. Box 1789
Madison, MS 39130-1789
601-898-1180
jeff@rawlingsmacinnis.net
MSB # 4642

Exhibit A

## CONSUMER LOAN NOTE, SECURITY AGREEMENT AND DISCLOSURE STATEMENT

LENDER: 21st Mortgage Corp. 620 Market St. Suite 100 Knoxville, TN 37902 NMLS No. 2280 Reference No:

Borrower's Name: ANTHONY I KANTZ
Co-Borrower's Name: LORI M KANTZ
Borrower's Address: 40 BLAKE BOTTOM DR ELLISVILLE MS 39437

Co-Signer's Name:
Co-Signer's Name:
Co-Borrower's Address: 40 BLAKE BOTTOM DR ELLISVILLE MS 39437

In this Consumer Loan Note ("Note"), "Borrower" refers to all persons who sign this Note as "Borrower" and "Co-Borrower", jointly and severally. "Lender" refers to 21st Mortgage Corporation ("21st Mortgage"), and its successors and assigns. Other capitalized terms are defined in the disclosures on this page and in the section of this Note titled, "Itemization of Amount Financed." Borrower promises to advise Lender in writing of any change of Borrower's mailing address while this Note is in effect. Lender should send any papers or notices concerning this Note to Borrower's mailing address. On the date of this Note, Borrower finances with Lender the manufactured home described below, together with the related services, furnishings, equipment, appliances and accessories included with the manufactured home (collectively, "Manufactured Home"). THIS NOTE IS SECURED BY AND INCORPORATES A MORTGAGE OR DEED OF TRUST.

Description of Manufactured Home: ☐ New ☒ Used

| MANUFACTURER: INDIES | YEAR: 2005 | ADDITIONAL ACCESSORIES AND FURNISHINGS: ITEM AND SERIAL NO. | |
|---|---|---|---|
| APPROX. LENGTH: 80 | APPROX. WIDTH: 28 | | |
| SERIAL NO. | AL28801055176A | | |
| SERIAL NO. | AL28801055176B | | |
| SERIAL NO. | | | |
| SERIAL NO. | | | |
| | | | |

**PROMISE TO PAY:** Borrower promises to pay Lender the "Unpaid Balance" as listed under the "Itemization of Amount Financed" plus interest. When Borrower signs this Note, Borrower will also pay Lender any "Prepaid Finance Charge" shown in the "Itemization of Amount Financed." Borrower authorizes Lender to include the Prepaid Finance Charges in the Unpaid Balance. Lender will compute and charge interest on the unpaid amount of the Unpaid Balance from the Note date at the yearly rate of **7.75%** (the "Note Rate"). When Lender calculates interest, every year shall have 360 days and every month shall have 30 days. Borrower promises to pay interest at the Note Rate on the unpaid amount of the Unpaid Balance of this Note until it is paid in full. Interest after the final scheduled maturity date on this Note, however, shall not exceed the maximum rate allowed by state law.

BORROWER FURTHER PROMISES to pay Lender monthly payments in the number and amounts of payments shown in Borrower's Payment Schedule. Borrower's first payment will be due on the first date shown in Borrower's Payment Schedule, and subsequent payments will be due on the same day of each month after that.

LENDER WILL APPLY EACH PAYMENT RECEIVED AS OF ITS SCHEDULED DUE DATE. If on the final scheduled payment due date, Borrower still owes amounts under this Note, Borrower will pay those amounts in full on that date (the "Maturity Date"). Borrower will make all payments to 21st Mortgage Corp., 620 Market St. Suite 100, Knoxville, Tennessee 37902, or any other address to which Lender directs Borrower to send Borrower's payments.

**SECURITY INTEREST:** To secure payment of all sums due or which become due under this Note, and Borrower's performance of all other terms of the Note, Borrower grants Lender a first priority security interest in (1) the Manufactured Home, and all accessions, attachments, accessories, replacements and additions to the Manufactured Home, whether added now or later; (2) the "Property" described in any mortgage or deed of trust Borrower gives to Lender; (3) Borrower's rights to refunds of premiums for and payments under, and proceeds of any insurance or any extended warranty or service contract purchased with the proceeds of this Note; (4) any amounts held in escrow by Lender for Borrower; and, (5) proceeds and products of all of the foregoing (collectively, the "Collateral"). Lender's security interest shall remain in effect until Borrower pays, in full, all amounts due under the Note. Despite any other provision of the Note, however, Lender is not granted, and does not have, a non-purchase money security interest in household goods, to the extent such a security interest is prohibited by applicable law. Borrower will pay any filing or recording fees necessary for Lender to obtain and hold a first priority security interest. To the extent allowed by law, Borrower also agrees to pay any release, discharge or termination fees, after the Borrower pays the Note in full. Borrower agrees to execute any application for certificate of title or ownership, financing statement or other document necessary to perfect Lender's security interest in the Manufactured Home. Borrower authorizes Lender to sign Borrower's name to any financing statement or application or other document necessary to perfect the security interest granted by Borrower herein. If Lender is taking a security interest in real property, such interest is reflected in a mortgage or deed of trust signed in conjunction with this Note.

Borrower's Initials AIK
Co-Borrower's Initials LMK

**TRUTH IN LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE<br>The cost of Borrower's credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost Borrower. | Amount Financed<br>The amount of credit provided to Borrower or on Borrower's behalf. | Total of Payments<br>The amount Borrower will have paid should Borrower make all payments as scheduled. |
|---|---|---|---|
| **8.41%** | **$121,380.56** | **$113,553.04** | **$234,933.60** |

**INTEREST RATE AND PAYMENT SUMMARY**

| | Rate & Monthly Payment |
|---|---|
| Interest Rate | 7.75% |
| Principal + Interest Payment | $978.89 |
| Est. Taxes + Insurance (Escrow) | $179.58 |
| **Total Est. Monthly Payment** | $1,158.47 |

**Security:** Borrower gives Lender a security interest in:

- ☒ The Manufactured Home
- ☒ Real property located at 40 BLAKE BOTTOM DR ELLISVILLE MS 39437

**Late Charge:** If a monthly payment is received by Lender later than fifteen (15) calendar days after it is due, Borrower will pay a late charge of the lesser of five dollars ($5.00) or four percent (4%) of the unpaid amount of such payment of principal and interest due. Other references in this Note to the "Late Charge" refer to the amount

**Prepayment:** If Borrower pays off early, Borrower will not have to pay a penalty.

**Assumption:** Someone buying the Manufactured Home may be allowed to assume the remainder of Borrower's obligations under this Note on the original terms only if such person is approved by Lender.

**Other Information:** Refer to the rest of this Note for additional information about nonpayment, default, any required payment in full before the scheduled date and prepayment refunds and penalties.

**MDIA Refinancing Warning:** There is no guarantee that Borrower will be able to refinance the loan to obtain a lower interest rate and/or payment.

**PROPERTY INSURANCE**

**PROPERTY INSURANCE ON THE MANUFACTURED HOME IS REQUIRED FOR THE TERM OF THIS NOTE. BORROWER HAS THE RIGHT TO OBTAIN SUCH INSURANCE FROM ANYONE AUTHORIZED BY LAW TO SELL IT AND IS REASONABLY ACCEPTABLE TO LENDER.** Borrower elects to finance through Lender the below listed property insurance of the specified type, term and premium.

| Hazard Insurance Provider | Term | Premium |
|---|---|---|
| None | | |

* A separate flood insurance policy may or may not be reflected in the information above or financed as part of the loan. Borrower should refer to the appropriate insurance policy documents for more details.

Borrower's signature below indicates Borrower's election to finance the above listed property insurance for the type, term and premium shown.

Borrower's Signature________________________ Co-Borrower's Signature________________________

THIS SPACE LEFT INTENTIONALLY BLANK

**ITEMIZATION OF AMOUNT FINANCED:**

| | |
|---|---|
| 1. Cash Price | |
| a. Manufactured Home and Land ** | $69,822.50 |
| b. Sales Tax | $0.00 |
| c. Total Cash Price (1a plus 1b) | $69,822.50 |
| 2. Down Payment | |
| a. Cash Down Payment | $0.00 |
| Trade-in ( ) | |
| Length: 0 Width: 0 | |
| Trade Allowance 0 Liens 0 | |
| b. Net Trade-In Allowance | 0 |
| c. Total Down Payment (2a plus 2b) | $0.00 |
| d. Manufacturer's Rebate | $0.00 |
| 3. Unpaid Cash Price for Purchase or Refinance | |
| a. Unpaid Portion of Cash Price (1c minus 2c and 2d) | $69,822.50 |
| OR | |
| b. For a Refinanced Loan, Amount Paid to Others | |
| 4. Amounts paid to others on Borrower's behalf | |
| a. To Insurance Companies ** | |
| i. Property Insurance ** | |
| ii. | |
| b. To Public Officials | |
| i. Certificate of Title | $0.00 |
| ii. Filing/Recording Fees ** | $0.00 |
| c. To Improvements Cost | $13,360.00 |
| d. To Title Company-Attorney Fees | $1,203.00 |
| e. To CONSOLIDATION | $26,834.89 |
| f. To CREDIT REPORT | $3.00 |
| g. To CASH OUT | $2,329.65 |
| h. | |
| i. | |
| j. | |
| Total of All Amounts ((a) through (j)) | $43,730.54 |
| 5. Prepaid Finance Charges (includes items paid to third parties; items may be financed in part and paid in cash in part) | |
| a. Financed | |
| i. To Flood Certification Fee | $8.00 |
| ii. To Loan Origination Fee | $5,677.65 |
| iii. | |
| iv. | |
| v. | |
| vi. | |
| b. Paid in Cash | |
| i. | |
| ii. | |
| iii. | |
| iv. | |
| v. | |
| vi. | |
| 6. Unpaid Balance (3a + 3b + 4 + 5(a)) | $119,238.69 |
| 7. Prepaid Finance Charges (total of all items in 5) | $5,685.65 |
| 8. Amount Financed (6 minus 7) | $113,553.04 |
| ** Lender may retain, or receive, a portion of these amounts | |

Security interest termination, release, discharge or satisfaction fees paid upon termination will vary based upon applicable law. This fee is not paid by Borrower at closing.

**BORROWER'S RIGHT TO PREPAY: BORROWER MAY PREPAY ANY AMOUNTS DUE UNDER THIS NOTE AT ANY TIME WITHOUT PENALTY.** A Principal only payment is known as a "Prepayment." Lender will not treat a payment as a Prepayment unless Borrower previously made all monthly payments of principal and interest and fully paid and satisfied all other obligations due under this Note. If Borrower meets these conditions, Borrower may make a Prepayment by sending such Prepayment in accordance with the instructions provided by Lender in a monthly billing statement, or payment coupon, or otherwise as directed by Lender. Borrower may make a full Prepayment or partial Prepayments without paying a Prepayment charge. If Borrower (1) prepays this Note in full, or (2) defaults and fails to cure the default and Lender demands payment of the entire balance due on this Note, no portion of any Prepaid Finance Charge will be refunded.

**PROPERTY INSURANCE:** Borrower is required to insure the Manufactured Home against physical damage, including loss by fire, hazards included within the term "extended coverage," and any other hazards for which Lender requires insurance, for the term of the Note at Borrower's expense. If Borrower financed the premium, the premium is financed over the term of the Note, even though the term of insurance is less than the Note term. The Borrower must obtain the types and amounts of insurance coverage required by Lender, including flood insurance if applicable. The insurance policy must contain a loss payable clause protecting Lender (as Lender's interest may appear), and provide for at least a 10 day notice of cancellation to Lender. Borrower agrees to provide written proof of such coverage to Lender within 5 days of Lender's request. BORROWER HAS THE RIGHT TO CHOOSE THE ENTITY THROUGH WHICH THE PROPERTY INSURANCE IS OBTAINED. Lender reserves the right to refuse to accept, for reasonable cause, an insurer chosen by the Borrower. If Borrower's insurance coverage expires or is canceled prior to payment in full of this Note, Borrower must obtain coverage in the amounts, types, and for the periods that Lender requires at Borrower's expense for the remaining term of the Note. Lender's property insurance coverage requirements can change during the term of the Note. Should Borrower fail to provide or maintain property insurance or fail to provide Lender with satisfactory evidence of coverage, or should the property insurance, for any reason, not protect Lender's interests, Lender, in its sole discretion, may obtain property insurance that meets its requirements, but is under no legal obligation to do so. Before obtaining insurance in these circumstances, Lender will, in good faith, attempt to inform Borrower in writing of the need for Borrower to obtain property insurance and/or to provide evidence thereof. If obtained by Lender, Lender will add the cost of the insurance to the amount due under the Note. That amount will become due and payable upon demand by the Lender, in payments added to Borrower's scheduled payments, or as otherwise required by Lender. Lender may charge Borrower interest on such cost at the Note Rate, unless prohibited by applicable law. The property insurance obtained by Lender may have material differences from insurance initially financed under the Note or from insurance obtained by the Borrower initially or at any time during the term of the Note. Such insurance may be significantly more expensive to Borrower than if Borrower obtained the insurance. **Consequently, Lender makes the following disclosures to Borrower: (a) The property insurance that Lender obtains is intended solely to protect the Lender's interest hereunder, and Lender may not obtain coverages beyond those to insure loss of or damage to the Manufactured Home; in particular, such insurance may not provide coverage for personal effects, adjacent structures, medical expenses or personal liability; additionally, such coverage may not insure the Manufactured Home in an amount equal to the Unpaid Balance due under this Note and, consequently, in the event of loss or damage, the insurance may not pay the full amount of the Unpaid Balance of the Note; (b) If Lender obtains this insurance due to Borrower default, Borrower acknowledges and agrees that Lender has no duty to obtain insurance on behalf of Borrower which is the least expensive, or which has a competitive marketplace premium or any other particular feature or special benefit; (c) Lender or its affiliates may be reimbursed for expenses and may profit from taking action to cure Borrower's default by providing and maintaining such insurance; (d) Borrower's execution of this Note authorizes Lender to provide third parties with any information necessary to obtain insurance on the Manufactured Home and monitor the status of such insurance; and (e) Borrower may, as stated above, at any time, including after Lender obtains property insurance on Borrower's behalf, obtain insurance through an agent or insurer of Borrower's choice. Upon so doing, Borrower may provide Lender with sufficient evidence of insurance coverage, at which time, Lender will cancel the insurance coverage it obtained on Borrower's behalf, obtain any refund due on the unearned portion of the premium, and apply the refund to the Unpaid Balance of the Note.** Property insurance proceeds (whether such insurance has been obtained by Borrower or Lender) shall be applied to the restoration or repair of the Manufactured Home, if it is economically feasible and does not lessen the Lender's security interest in the Manufactured Home. If this is not the case, or if the insurer determines that the Manufactured Home represents a total loss under the coverage, Lender will apply such insurance proceeds to reduce all amounts owing under this Note, whether or not such amounts are due and payable. Borrower authorizes Lender to (a) adjust or settle Borrower's claim for loss under such insurance; (b) sign Borrower's name to any check, draft or other documents necessary to obtain such insurance proceeds; and (c) hold such insurance proceeds until Lender has the opportunity to inspect the Manufactured Home and ensure that work to restore or repair the Manufactured Home is completed to Lender's satisfaction, without incurring an obligation to pay Borrower earnings or interest on such proceeds. Lender may disburse proceeds in a single payment or a series of payments and Borrower authorizes any insurer to make such payment directly to Lender. If insurance proceeds paid to Lender do not satisfy all amounts Borrower owes to Lender under this Note, Borrower is responsible for paying the balance.

**ESCROW ITEMS:** To the extent permitted by law, Lender may, at Lender's option, require Borrower to make payments in addition to those set forth in Borrower's Payment Schedule ("Escrow Payments") which Lender will collect and hold for (1) the payment of property insurance premiums required under this Note, (2) the payment of taxes and assessments, and (3) other items which might attain priority over Lender's security interest (each, an "Escrow Item"). Lender will use Borrower's Escrow Payments to pay Escrow Items as they come due. **THE BORROWER'S PAYMENT SCHEDULE IN THIS NOTE DOES NOT INCLUDE ANY AMOUNT TO BE PAID UNDER ANY SUCH ESCROW ACCOUNT.**

**SERVICING CHARGES:** Borrower agrees to pay all reasonable charges for Lender's performance of additional services requested by Borrower in connection with the servicing of this Note, to the extent permitted by applicable law.

**ADVANCES TO PROTECT THE COLLATERAL:** If Borrower fails to pay for required insurance, if Borrower fails to pay park or lot rent (and any other related charges), if Borrower fails to satisfy taxes, assessments, or other liens or encumbrances against the Manufactured Home, if Borrower fails to keep the Manufactured Home in good repair or if Borrower fails to make any other payments required by this Note or applicable law, Lender may (but is not required to) make such repairs or payments as Lender chooses. Lender will add any and all such payments and any amounts Lender pays to protect or enforce Lender's security interest to the amount Borrower owes Lender under this Note, and all such amounts will be secured by the Collateral. At Lender's sole option, Lender may (1) demand that Borrower repay these amounts immediately, or (2) add these amounts to Borrower's regularly scheduled payments, or (3) add these amounts as additional installments due, or (4) add these amounts to the final installment due on this Note. Unless prohibited by law, Borrower agrees to pay interest at the Note Rate on any amounts that Borrower does not repay immediately.

**DELINQUENCY AND DEFAULT:** Time is of the essence. If a payment is more than 15 days late, Borrower agrees to pay the Late Charge indicated in the "Truth in Lending Disclosures" section of this Note. If any check, negotiable instrument of withdrawal, electronic payment draft or any other instrument is dishonored by Borrower's financial institution, Borrower will pay a fee of $20.00, in addition to being required to make payment on the item. Borrower will be in default under this Note if: (1) Borrower fails to make any payment when due; (2) Borrower otherwise fails to perform any of Borrower's obligations under this Note or under any mortgage or deed of trust which secures this Note; (3) Borrower dies or becomes legally unable to manage Borrower's affairs; (4) any statement of fact, representation or warranty Borrower makes to Lender in Borrower's application for credit, any other document submitted to the Lender or signed by Borrower in connection with this Note, or in any Note document is false, misleading, inaccurate, or incomplete; or (5) Borrower files a petition in bankruptcy, or a party files a petition in bankruptcy against Borrower. In the event of Borrower's default, Lender will give Borrower notice of the default and right to cure the default ("Notice of Default"). Borrower is not entitled to a Notice of Default if Borrower abandons or voluntarily surrenders the Manufactured Home, or if other extreme circumstances exist. Borrower is not, under any circumstances, entitled to a Notice of Default more than twice in any one year period. If Borrower does not cure the default within 30 days after the postmarked date of the Notice of Default, or if a Notice of Default is not required to be sent, Lender may (1) accelerate the maturity of the debt and require Borrower to pay Lender the entire remaining balance and all other amounts due under the Note, (2) require Borrower to make the Manufactured Home available to Lender, (3) take legal action against Borrower, (4) repossess the Manufactured Home, (5) enforce such rights and remedies available to Lender under the Uniform Commercial Code and other applicable law, and (6) foreclose on the real property, if applicable. Lender, at its sole option, may elect to sever and remove the Manufactured Home from any real property where it is located, regardless of whether the real property secures this Note. In the event of default, Borrower also agrees to pay Lender's expenses for (a) reasonable attorney's fees permitted under law after referral to an attorney who is not a salaried employee of the Lender; (b) court costs and disbursements; and (c) costs of repossessing the Manufactured Home including the costs of storage, reconditioning, and resale. Before Lender sells the Manufactured Home, Borrower can get the Manufactured Home back if Borrower either (1) pays off the Note by paying Lender the entire remaining balance and all other amounts due under the Note (redeem), or (2) cures the default by paying Lender the amounts which are past due, including Late Charges (reinstate). Regardless of whether Borrower redeems or reinstates, and before Borrower can get the Manufactured Home back, Borrower must also (1) pay Lender the cost of taking, storing and redelivering the Manufactured Home and other expenses Lender incurs; (2) pay Lender all other charges and other expenses provided for under this Note; (3) pay any amounts advanced by Lender to protect the Collateral, without regard to any agreement to repay such amounts advanced on a periodic basis, including but not limited to unpaid insurance premiums, park or lot rent, taxes, assessments or similar items; and (4) cure any other defaults. Borrower's rights to redeem and/or reinstate end upon sale of the Manufactured Home unless otherwise required by law. All rights and remedies under this Note and any mortgage or deed of trust executed herewith are cumulative, but Borrower's right to a written notice of default and 30 days to cure, as set forth in this Note, shall not be affected by any inconsistent provision of any mortgage or deed of tru st. Any personal property of Borrower's located in or attached to the Manufactured Home and not subject to Lender's security interest may be held by Lender without liability if the Lender repossesses the Manufactured Home. Borrower will be deemed to have waived any claim to such personal property unless written demand by certified mail is made upon Lender within twenty-five (25) days after repossession. If Borrower fails to give Lender such written demand, Lender may dispose of such personal property.

**INFORMATION SHARING:** Lender may investigate Borrower's credit history and credit capacity in connection with establishing, modifying, extending, and/or enforcing Borrower's account, and share information about Borrower and Borrower's account with credit reporting agencies and others as allowed by law. Lender may also verify Borrower's employment, income, assets, and debts; and anyone receiving a copy of this Note is hereby authorized to release such information to Lender. Borrower authorizes Lender to release to third parties any information necessary to monitor the status of insurance on Borrower's Manufactured Home, and to obtain the insurance described in this Note. If Borrower's Manufactured Home is on rented property or property that is not owned by Borrower, Borrower authorizes Lender and Borrower's landlord (or the property owner) to exchange information as to Borrowers obligations to Lender under this Note and the status of such obligations, information relating to Lender's security interest in Borrower's Manufactured Home, and information regarding the lease or arrangement between Borrower and landlord (or the property owner), as well as the obligations and status of such obligations to landlord (or the property owner). Whether or not the Borrower rents the Manufactured Home to a party in accordance with the terms of this Note, Borrower authorizes Lender and Borrower's renter to exchange information as to Lender's security interest in Borrower's Manufactured Home and the rental agreement or arrangement, as well as to the obligations, and the status of such obligations of Borrower to Lender under this Note. This provision also applies to any Co-Signer who executes this Note.

**OTHER TERMS AND CONDITIONS:** Borrower will not move the Manufactured Home without Lender's prior written consent. Borrower will not sell the Manufactured Home without Lender's prior written consent. Borrower agrees that the Manufactured Home is, and shall remain, during the term of this Note, personal property. Unless Lender gives prior written consent, Borrower shall not allow the Manufactured Home to become a part of real estate or to lose its status as personal property under applicable law. Borrower will not encumber or abandon the Manufactured Home, nor allow any lot lien, landlord lien, or similar lien, which may by law be superior to Lender's security interest, to encumber the Manufactured Home. Borrower will not use the Manufactured Home for illegal activity. Borrower will not use the Manufactured Home for business or hire, or rent it to another party, without obtaining Lender's prior written consent. Borrower will pay promptly all taxes, assessments, and any liens and encumbrances on the Manufactured Home. Borrower will notify Lender promptly of any loss or damage to the Manufactured Home, as well as any condemnation, confiscation or theft of the Manufactured Home. Upon Lender's request, Borrower will promptly provide Lender with proof satisfactory to Lender that: (1) Borrower has the insurance required under this Note; (2) Borrower has paid all taxes assessed against the Manufactured Home; (3) Borrower has paid all park or lot rent (and any other related charges) due; (4) Lender holds the only lien against the Manufactured Home; (5) the Manufactured Home is in good condition and repair; and (6) Borrower has complied with all of the promises Borrower made in this Note. Lender may inspect the Manufactured Home at any time. If Borrower is married, and residing in a community property state, both Borrower's community property and separate property are liable for all payments under this Note. Borrower waives all marital rights, homestead exemption and other exemptions relating to the Collateral. Borrower will cooperate with Lender regarding any requests after closing to correct any errors with respect to this Note or the transaction and agrees to provide any and all additional documentation deemed necessary by Lender to complete this transaction. Lender may rely on a telecopy, photocopy, or electronically imaged copy of this Note as if it were an original, including use in legal proceedings or arbitrations. Borrower acknowledges that any broker or other third party used to facilitate this transaction may receive compensation from Lender for its services.

**ASSUMPTION:** Someone buying the Manufactured Home may assume the remainder of Borrower's obligations under this Note on the original terms only if such person is approved by Lender.

**ASSIGNMENT:** Lender may assign this Note to any person or entity. All rights granted to Lender under this Note shall apply to any assignee of this Note.

**WAIVER AND MODIFICATION:** Lender's waiver of any default shall not constitute a waiver of any other default. The procurement of required property insurance, or the payment of taxes, or other liens, or other charges, by Lender shall not be a waiver of Lender's right to accelerate the maturity of this Note and declare default herein. To the extent permitted by law, Borrower agrees to give up Borrower's rights to require Lender to do certain things. Borrower does not give up any rights that are provided in this Note. Unless the law or this Note provides otherwise, Lender is not required to: (1) demand payment of amounts due; (2) give notice that amounts due have not been paid, or have not been paid in the appropriate amount, time, or manner; or, (3) give notice that Lender intends to make, or is making, this Note immediately due.

**WARRANTIES:** LENDER MAKES NO WARRANTIES ON THE MANUFACTURED HOME, AND EXPRESSLY EXCLUDES ANY EXPRESS OR IMPLIED WARRANTY, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, UNLESS GIVEN TO BORROWER BY LENDER IN WRITING AT THE TIME OF SALE. BORROWER AGREES THAT THE YEAR OF THE MANUFACTURED HOME IS FOR IDENTIFICATION PURPOSES ONLY AND MAY NOT BE THE BASIS FOR A WARRANTY OR OTHER CLAIM AGAINST LENDER. THE ABOVE DISCLAIMERS DO NOT AFFECT ANY WARRANTIES COVERING THE MANUFACTURED HOME THAT MAY BE PROVIDED BY THE MANUFACTURER, OTHER THIRD PARTIES, OR THAT ARE REQUIRED BY LAW.

**VALIDITY AND EFFECTIVENESS:** Wherever possible each provision of this Note shall be interpreted in such a manner as to be effective and valid under applicable law. If any provision of this Note is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, however, the remainder of such provision or the remaining provisions of this Note shall not be invalidated. This Note shall be governed both as to issues of formation and performance by the laws of the state where the Manufactured Home is located and applicable federal law. This Note shall have no effect until and unless signed by Borrower and Lender. Lender does not intend to charge or collect any interest, charge, or fee greater than the law allows. If Lender charges or collects any amount greater than what the law allows, Lender will apply the excess to the Unpaid Balance and any other amounts due under the Note and shall refund any excess. Lender will treat any amount applied to the Unpaid Balance as a partial Prepayment.

**ENTIRE AGREEMENT:** This Note, any separate escrow agreement, and any mortgage or deed of trust, together, the "Entire Agreement Documents," shall constitute the entire agreement between Borrower and Lender. To the extent permitted by applicable law, Borrower agrees that no representations, oral or written, have been made to Borrower to induce Borrower to enter into the Entire Agreement Documents, except as set forth therein.

**GUARANTY:** Any Co-Signer signing the guaranty of this Note agrees that all amounts owed under this Note will be paid when due. Co-Signer's obligation continues even if Borrower is released or if Lender waives or delays enforcement of any rights under this Note. Lender need not give Co-Signer notice of any such waiver, delay or release. See Notice to Co-Signer before signing this guaranty.

THIS SPACE LEFT INTENTIONALLY BLANK

**ARBITRATION:**

A. Agreement to Arbitrate: Borrower and Lender (sometimes called the "Parties") agree to mandatory, binding arbitration ("Arbitration") of all disputes, claims, controversies, grievances, causes of action, including, but not limited to, common law claims, contract and warranty claims, tort claims, statutory claims, and, where applicable, administrative law claims, and any other matter in question ("Claims") arising from or relating to this Note, any products/goods, services, insurance, or real property (including improvements to the real property) sold or financed under this Note, any events leading up to this Note, the collection and servicing of this Note, and the interpretation, scope, validity or enforceability of this Note (with the exception of this agreement to arbitrate, the "Arbitration Agreement"). The interpretation, scope, validity or enforceability of this Arbitration Agreement or any clause or provision herein and the arbitrability of any issue shall be determined by a court of competent jurisdiction. Borrower and Lender agree that the scope of this Arbitration Agreement is intended to cover only Claims brought by Borrower on an individual basis and not on a representative basis as a class action, which includes similar actions that involve the aggregation of individual Claims of Borrower and other persons into a single proceeding. Notwithstanding any other provision of this Arbitration Agreement or any determination as to the enforceability of this Arbitration Agreement or the arbitrability of any Claims, Borrower and Lender expressly agree not to arbitrate any Claims as a class action. This Arbitration Agreement is the only agreement between Borrower and Lender regarding Arbitration, and takes the place of any other agreements to arbitrate. If Borrower has Claims against others (each, a "Third Party") related to or arising from facts or circumstances covered by this Arbitration Agreement (including, but not limited to (i) the design, construction and manufacture of the Manufactured Home, (ii) the advertising and the sale of the Manufactured Home, (iii) the delivery or the installation of the Manufactured Home, and (iv) insurance covering the Manufactured Home or Borrower, including title insurance, where applicable (each, a "Related Claim")), then Borrower and Lender agree to consolidate the Arbitration of Borrower's Claims against Lender, brought on an individual basis, with the Arbitration of any and all Related Claims, brought on an individual basis, into one Arbitration to be governed by this Arbitration Agreement, provided, however, that the Third Party must agree to be joined in the Arbitration of the Related Claims under this Arbitration Agreement. If any Third Party does not agree to be joined in the Arbitration of its Related Claim, then Arbitration under this Arbitration Agreement shall proceed without that Third Party. Borrower agrees not to arbitrate any Related Claims as a class action. This Arbitration Agreement also covers all co-signors and guarantors who sign this Note and any occupants of the Manufactured Home (as intended beneficiaries of this Arbitration Agreement). Borrower agrees that the Manufactured Home contains parts manufactured outside of the state where the home is sold and delivered; the manufacture, transportation, sale and use thereof has been and will continue to be regulated by the laws of the United States of America and involve and affect interstate commerce.

B. Facts About Arbitration: Arbitration is a process in which a neutral arbitrator decides a dispute instead of a judge or jury. Each side has an opportunity to present evidence to the Arbitrator, both in writing and through witnesses. Arbitration proceedings are less formal than court trials. Other rights that the Parties have in court may not be available in Arbitration. The information that can be obtained in discovery from each other or from third persons in Arbitration is generally more limited than in a lawsuit. An Arbitrator will decide the case by issuing a written decision called an "award." Once confirmed, an award may be enforced as a court judgment in accordance with federal or state law. The circumstances under which a court can review an award are more limited in Arbitration.

C. Rules: The Arbitration shall be governed by and conducted under: (a) the Federal Arbitration Act, 9 U.S.C. §§ 1 9; (b) the arbitration rules ("Arbitration Rules") of the American Arbitration Association ("AAA") (the "Arbitration Administrator") in effect at the time Arbitration is requested, at the election of the Party filing for Arbitration; and (c) this Arbitration Agreement. A copy of the Arbitration Rules may be obtained, free of charge, from the AAA, on the Internet at www.adr.org, by calling 800-778-7879, or by writing to: American Arbitration Association, 1633 Broadway, 10th Floor, New York, NY 10019. If the terms of this Arbitration Agreement and the Arbitration Rules conflict, the terms of this Arbitration Agreement shall control to the extent of the conflict. The person who conducts the Arbitration (the "Arbitrator") shall have all powers provided by the Arbitration Rules and this Arbitration Agreement. After the Arbitrator is selected, the Arbitrator, in accordance with the Arbitration Rules, will set a reasonable schedule, in light of the nature and complexity of the Claims, for the Arbitration and discovery, including any depositions, the exchange of written documents, the final deadline for discovery prior to the Arbitration, and other discovery matters addressed in the Arbitration Rules. The Arbitration shall be conducted in the largest city in the federal judicial district where Borrower resides, or at any other place mutually acceptable to Borrower and Lender. At the election of either Borrower or Lender (and at the expense of the electing party), the Arbitration may be recorded and transcribed by a court reporter. Judgment upon the award rendered may be entered in any court having jurisdiction. The Parties agree that information exchanged in the Arbitration shall be held confidentially, and shall not be used in other arbitrations or court proceedings. All statutes of limitation that would otherwise apply to a Claim in a judicial action shall apply to the Arbitration of that Claim under this Arbitration Agreement. The Arbitrator shall apply applicable substantive law and shall honor claims of privilege recognized at law and consider defenses that a court could consider. The Arbitrator's decision shall be in writing, and shall include the Arbitrator's reasons for the award, including detailed findings of fact and conclusions of law. The Arbitrator may award the prevailing party in the Arbitration with that party's reasonable attorney's fees and any fees paid to commence the Arbitration, including the Arbitrator's fees, if such are available under applicable law. Any Claim or counter-claim (including compulsory or permissive under law) of a party must be made in the Arbitration, and the failure to bring such Claim or counterclaim shall constitute a waiver of and a bar to bringing such claim or counterclaim in an later Arbitration or action in court.

D. Fees and Costs: The fees and costs imposed by the Arbitration Administrator associated with the Arbitration, including the Arbitrator's fees, shall be paid in accordance with the Arbitration Rules and this Arbitration Agreement. Borrower may request that the Arbitration Administrator reduce or waive Borrower's fees, or that Lender voluntarily pay an additional share of the fees and costs (however, such request does not obligate Lender to do so), based upon Borrower's financial circumstances or the nature of Borrower's Claim.

E. Class Action Waiver: Borrower waives the right to participate as a representative or member in a class action or otherwise join Borrower's Claims with those of any other person.

F. Joinder of Arbitrations: Except as provided expressly in Paragraph A. of this Arbitration Agreement with respect to the Arbitration of Borrower's individual Related Claims, Borrower and Lender agree to give up any right to consolidate or join any individual Arbitration with the Arbitration of others.

G. Exceptions: Notwithstanding any other provision of this Arbitration Agreement, Borrower agrees that Lender may use judicial process (filing a lawsuit) to: (a) enforce the security interest granted in this Note or any related mortgage or deed of trust, and (b) seek preliminary relief, such as a restraining order or injunctive relief, in order to preserve the existence, location, condition, or productive use of the Manufactured Home or other Collateral. Borrower and Lender also agree that this Arbitration Agreement does not apply to any Claim where the amount in controversy is less than the jurisdictional limit of the small claims court in the jurisdiction where Borrower resides, *provided, however*, that the Parties agree that any such small claims Claim may only be brought on an individual basis and not as a class action. Bringing a court proceeding described in this Paragraph G., however, shall not be a waiver of Lender's or Borrower's right to compel Arbitration of any other Claim that is covered by this Arbitration Agreement, including Borrower's counterclaim(s) in a suit brought by Lender. Borrower and Lender give up the right to serve as a private attorney general in any jurisdiction in which such procedure might be permitted.

H. Severability: If it is determined that any paragraph or provision in this Arbitration Agreement (other than the Class Action Waiver in Paragraph E., the agreement with respect to joinder of Arbitrations in Paragraph F., or the agreement of Borrower and Lender not to arbitrate class actions generally) is illegal, invalid, or unenforceable, such illegality, invalidity or unenforceability shall not affect the other paragraphs and provisions of this Arbitration Agreement and the remainder of this Arbitration Agreement shall continue in full force and effect as if the severed paragraph or provision had not been included. Notwithstanding this severability provision or any other provision of this Note or Arbitration Agreement, if a court of competent jurisdiction finally determines the Class Action Waiver in Paragraph E., the agreement with respect to joinder of Arbitrations in Paragraph F., or the agreement of Borrower and Lender not to arbitrate class actions generally, to be illegal, invalid, or unenforceable, then the Parties agree that such waiver shall not be severed and that this Arbitration Agreement shall be void in its entirety without effect on the remainder of this Note.

I. Survival of Arbitration Agreement: This Arbitration Agreement will survive and continue in full force and effect notwithstanding rescission, cancellation, termination, amendment, payment in full, discharge in bankruptcy, or other expiration or conclusion of this Note or any other contract or transaction between the Parties, unless otherwise agreed to in writing by the Parties. In addition, Borrower understands and acknowledges that the rights afforded to Lender under this Arbitration Agreement survive any assignment of this Note by Lender and that Lender can enforce this Arbitration Agreement in the event a Claim arises after the assignment of this Note.

J. Rules of Construction: If there is a disagreement on the interpretation of this Arbitration Agreement, this Arbitration Agreement shall be construed to require Arbitration, rather than to defeat it, except for class actions, which the Parties agree not to arbitrate. Borrower and Lender waive the rule of construction that requires a tribunal to construe a vague or ambiguous provision against the drafting party.

**K. Jury Waiver: Borrower and Lender hereby expressly and irrevocably waive any right to a trial by judge or jury of any Claims covered by this Arbitration Agreement. This waiver will remain enforceable even if any portion of this Arbitration Agreement is otherwise found to be unenforceable. The Parties agree that this waiver is made knowingly, willingly, and voluntarily.**

**L. NOTICE: BORROWER UNDERSTANDS THAT THIS ARBITRATION AGREEMENT IS AN IMPORTANT AGREEMENT AND THAT THE TERMS OF THIS ARBITRATION AGREEMENT AFFECT BORROWER'S LEGAL RIGHTS. BY SIGNING THIS NOTE, BORROWER ACKNOWLEDGES THAT BORROWER HAS READ, UNDERSTANDS AND AGREES TO BE BOUND BY THIS ARBITRATION AGREEMENT. IF BORROWER DOES NOT UNDERSTAND ANY OF THE TERMS OR PROVISIONS OF THIS ARBITRATION AGREEMENT, INCLUDING ADVANTAGES OR DISADVANTAGES OF ARBITRATION, THEN BORROWER SHOULD SEEK INDEPENDENT LEGAL ADVICE BEFORE SIGNING THIS NOTE.**

**TO CONTACT 21ST MORTGAGE CORPORATION ABOUT THIS ACCOUNT CALL (865) 523-2120 OR 1-800-955-0021.**

**NOTICE**

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR (BORROWER) COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR (BORROWER) SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR (BORROWER) HEREUNDER.**

**NOTICE TO THE CONSUMER**

**(1) DO NOT SIGN THIS NOTE BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES; (2) YOU ARE ENTITLED TO AN EXACT COPY OF THE NOTE YOU SIGN. KEEP IT TO PROTECT YOUR LEGAL RIGHTS; (3) BY SIGNING THIS NOTE, YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS NOTE; AND, (4) AT ANY TIME, YOU HAVE THE RIGHT TO PAY IN ADVANCE THE UNPAID BALANCE DUE UNDER THIS NOTE WITHOUT PENALTY.**

**SIGNATURE OF BORROWER(S): "Borrower" refers to all persons who sign this Note as "Borrower" and "Co-Borrower", jointly and severally. Borrower's signature(s) below indicates the following: 1) Borrower has fully and completely read all of this Note; 2) Borrower has consulted independent legal counsel to clarify any matters, if Borrower deemed such was necessary; 3) Borrower has no questions regarding any matters contained in this Note and understands all terms, conditions and obligations set forth in this Note; and, 4) Borrower agrees to fully satisfy and abide by all terms, conditions and obligations set forth in this Note.**

**CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

✓ Anthony I Kantz 1-25-11
ANTHONY I KANTZ (Borrower) Date

✓ Lori M Kantz 1/25-11
LORI M KANTZ (Co-Borrower) Date

**SIGNATURE OF GUARANTOR(S): The undersigned, jointly and severally, agree(s) to pay all amounts due on this Note until all amounts due on this Note are paid in full. The undersigned also agree(s) to all the terms and conditions of this Note.**

______________________ ________
(Co-Signer) Date

______________________ ________
(Co-Signer) Date

---

**NOT VALID UNLESS ACCEPTED BY LENDER:** Janie Keith
21ST MORTGAGE CORPORATION

By: Janie Keith Acct Rep 1/28/11
Printed Name Title Date

Initialing below is not necessary. Borrower(s) should sign above.

**Exhibit B**

Jones County, 2nd Dist Laurel MS
I certify this instrument
was filed and recorded
FEBRUARY 15 2011 09:23:47AM
Instrument 21100922 Page 1 of 18
Larry D. Fishee, Chancery Clerk
By ________, D.C.

## DEED OF TRUST RECORDING COVER PAGE

**PREPARED BY AND RETURN TO:**

21st Mortgage Corporation
Jeanie Keith
620 Market Sq.
Knoxville, TN 37902
800 955 0021

**INDEXING INSTRUCTIONS**: Parcel of Land Lying in the SE/14 of the NE 1/4 of Section 14, Township 8 North, Range 13 West, Second Judicial District of Jones County, Mississippi

**GRANTORS**: Anthony I. Kantz
Lori M. Kantz
40 Blake Bottom Dr
Ellisville, Mississippi 39437

**GRANTEE**: 21st Mortgage Corporation
One Centre Square
620 Market Sq.
Knoxville, TN 37902
800 955 0021

After Recording Return To:
**21st Mortgage Corp**
**P.O. Box 477**
**Knoxville, TN 37901**
**ATTN: Jeanie Keith**

**[Space Above This Line For Recording Data]**

# DEED OF TRUST

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated January 25, 2011, together with all Riders to this document.
**(B) "Borrower"** is **Anthony I. Kantz and wife, Lori M. Kantz** . Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is **21st Mortgage Corporation**. Lender is a **Corporation** organized and existing under the laws of the state of **Delaware**. Lender's address is **620 Market Street One Centre Square, Knoxville, TN 37902**. Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is **Tim Williams**.
**(E) "Note"** means the promissory note signed by Borrower and dated _January 25, 2011. The Note states that Borrower owes Lender **One Hundred Nineteen Thousand, Two Hundred Thirty-Eight Dollars 69/100** (U.S. $**119,238.69)** plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **February 15, 2031**.
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Other(s) [specify]________ |
| ☐ 1-4 Family Rider | ☐ Biweekly Payment Rider | |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably

grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County** of **Jones:**

Including an Exhibit "A" and a **2005 Indies Mobile Home, 80 x 28, with a serial number of AL2880I055176AB**

which currently has the address of **40 Blake Bottom Drive**
[Street]

**Ellisville**, Mississippi **39437** ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the

Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste

on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for

damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security

Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of

transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give Borrower, in the manner provided in Section 15, notice of Lender's election to sell the Property. Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at such time and place in TATE County as Trustee designates in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. If Trustee is requested to cancel this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

______________________ Anthony I. Kantz (Seal)
**Anthony I. Kantz** - Borrower

______________________ Lori M. Kantz (Seal)
**Lori M. Kantz** - Borrower

**[Space Below This Line for Acknowledgment]**

STATE OF Mississippi
COUNTY OF Jones

Before me, the undersigned, a Notary Public in and for said County and State, on this day personally appeared **Anthony I. Kantz and Wife, Lori M. Kantz,** known to me to the person whose name subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of the Office this the 25 day of January, 2011.

Sue Walters
Notary Public in and for Jones County,

My commission expires: 7-9-11

SUE WALTERS
NOTARY PUBLIC
Expires July 9, 2011
FORREST COUNTY, MS

# EXHIBIT A

**LEGAL DESCRIPTION**
**40 Blake Bottom Drive Ellisville, MS 39437**
**JONES County**

**A parcel of land lying in the SE /14 of the NE 1/4 of Section 14, Township 8 North, Range 13 West, Second Judicial District of Jones County, Mississippi described as follows:**

**Commencing at the SW/C of the SE ¼ of the NE 1/4 of Section 14, Township 8 North, Range 13 West, Second Judicial District, Jones County, Mississippi, this point also being the Point of Beginning, thence run North 1318.08 feet, thence run East 193.43 feet, thence run South 466.69 feet, thence run East 466.69 feet, thence run South 210.00 feet thence run West 420.00 feet, thence run South 210.00 feet, thence run West 86.11 feet, thence run South 431.39 feet, thence run West 154.01 feet back to the Point of Beginning. Containing 7.94 acres.**

pd/m
Capstone Title Serv. LLC